[Civ. No. 4851. Fifth Dist. Aug. 10, 1981.]

JOHN E. KING, Plaintiff and Appellant, v.
WILLIAM N. HINDERSTEIN, Defendant and Respondent.

COUNSEL

Duenow, Burke & Smith, Evans J. Barbieri and J. Edmund Smith for Plaintiff and Appellant.

William N. Hinderstein, in pro. per., Hovis, Sherr, del Campo & Petersen, Robert A. del Campo and Frank J. Pantangelo for Defendant and Respondent.

OPINION

**ZENOVICH, Acting P. J.**—This is an appeal from a judgment in favor of defendant William N. Hinderstein (hereinafter Hinderstein) following a court trial wherein plaintiff John E. King, doing business as San Juan Pools of San Luis Obispo (hereinafter King), sought damages and foreclosure of a mechanics' lien against Hinderstein.[1]

---

[1]King did not present any evidence at the subsequent court trial on the mechanics' lien claim.

Sometime in December 1976, Hinderstein decided to construct a home on some property he owned in Atascadero. After preparation of some preliminary plans by an architect, Hinderstein contacted some contractors and received bids on the construction. Bill Poe, doing business as Cal Coast Construction, a licensed general building contractor, gave an oral bid of $69,000, a sum which included plans for the house and a pool.[2] Because of lender requirements, Hinderstein entered into a written contract with Poe on May 4, 1977. Under the contract, Hinderstein was to pay $85,000 for Poe's construction of a house. Hinderstein indicated that $10,000 was earmarked for construction of a pool.[3]

Poe made investigations about the type of pool to be built, comparing the differences between a conventional gunite pool and a prefabricated fiberglass pool. Poe set up a meeting between Hinderstein and Stuart W. Shore III, an employee of San Juan Pools of San Luis Obispo. On August 4, 1977, Hinderstein entered into a written agreement with San Juan Pools (via Shore) for installation of a prefabricated swimming pool on Hinderstein's property for a total price of $9,754. This contract stated that San Juan Pools (as Seller) was to furnish and/or install the following items: a 16-foot by 34-foot pool shell, filter, cart, diving board, heater, equipment pads and forms, underwater light, ladders, wedge anchors, ladder escutcheons, slide, solar stubouts, slide water line, pool fill line, gas line, electrical line, plumbing line to filter, 400 square feet of concrete, check valve, thermometer, time clock, G.F.I., certain maintenance equipment, and startup chlorine. Hinderstein (as Buyer) was to provide electrical, gas line and concrete decking exceeding the footage agreed to be provided by San Juan Pools, as well as being responsible for removal and replacement of an access fence. The contract also contained various "Agreed Conditions," among them the following: "7. Buyer agrees to pay any additional costs for the removal of any underground obstacles, removing, refilling and compacting filled ground, control of water seepage, or other unusual ground conditions, including rock beyond the capability of a 12 foot to 14 foot back hoe to remove.

"...

---

[2]Hinderstein stated that "the original house specs did not have a definite placement for the pool, ..." Although the schematic drawings may have indicated a place for the pool, it was concretely inserted in the house plans at a later time. Nonetheless, Hinderstein conceded that he intended "at all times to have a pool."

[3]Hinderstein understood that the original bid of $69,000 had to be inflated because of "extras that had brought the price up" and because of the planned pool construction.

"16. Construction to commence August 31, 1977 and Pool to be completed September 10, 1977, barring delays by acts of God, strike or reasons beyond Seller's control which could not be reasonably anticipated." On August 5, 1977, San Juan Pools received a $3,251 check from Hinderstein as a down payment on the pool construction. This payment represented approximately one-third of the total cost for the swimming pool work.[4]

San Juan Pools entered into the pool contract with Hinderstein through Shore, King's authorized agent.[5] It was a direct contractor for the work because King, doing business as San Juan Pools,[6] did not want Poe (the general contractor on the construction of the house) to be a middleman for the pool installation. Hinderstein never had any conversations with King before executing the agreement on August 4; he only dealt with Shore.[7] Neither King, Shore, nor any of the subcontractors used for the pool work held a valid class C-53 (swimming pool specialty) contractor's license. During the time of the pool work, King only possessed a class B license (a general contractor's license), issued on July 1, 1977, in the name of "King Development Company." The trial court found that this class B license number did not appear on any agreements executed between Hinderstein and Shore. King, doing business as San Juan Pools, did not possess any California contractor's license between March 17, 1973, and March 17, 1978. The contractor's license number listed on the August 4 agreement for San Juan Pools was later admitted by King to be nonexistent and to have been erroneously typed on the contract.

Work on the pool commenced and was completed sometime in November 1977. Shore was the one who kept contact with Hinderstein,

---

[4]Hinderstein apparently did not modify his contract with Poe to reflect the fact that another contractor was installing the pool.

[5]In describing Shore's duties with San Juan Pools, King stated: "He was primarily responsible for essentially overseeing the entire operation. He participated from the sales level through the construction of a pool."

[6]Although King initially denied that San Juan Pools was an incorporated entity, documents introduced at trial showed it was a California corporation. King stated he was unaware that his attorney had actually finalized incorporation of San Juan Pools. King later testified, "Since there haven't been any assets exchanged, [the attorney responsible for San Juan Pools' incorporation] informed me that it isn't really an entity, per se."

[7]Although admitting he directly contracted with San Juan Pools for the pool construction, Hinderstein "was led to believe by [Poe] that he was going to subcontract the pool for me." Hinderstein conceded that San Juan Pools never contracted to build his residence.

and Hinderstein said he never conversed with King during the course of the pool project. King never visited the job site, was frequently out of town during the installation/construction, and was unclear on the regularity of his contact with Shore. Shore was the individual who supervised the pool project from the initial sale to its eventual construction. In accordance with this evidence, the trial court found that "[King] took no active part in the supervision and construction in performing the contract for [Hinderstein]; [King] had never been on [Hinderstein's] property at any time before construction commenced, during construction, or after completion of construction."

King testified that there is a considerable difference in how conventional gunite pools and prefabricated pools are installed. He noted that no steel or gunite is used in the installation of a prefabricated pool, which is completely constructed in an independent factory. Nonetheless, King said that "the construction activities are considerable" with a prefabricated pool. King conceded that San Juan Pools hired five subcontractors who engaged in the following work on the Hinderstein project: excavation, pouring of a concrete walkway around the pool, grounding of electrical mechanisms, plumbing, and running of conduits to the pool. From such evidence, the trial court determined: "In the installation of the pool in question, there were more than two unrelated building trades or crafts involved."

Soon after completion of the pool (around Nov. 10 or 15, 1977), San Juan Pools entered into a second written contract for the Hinderstein pool work. This contract (bearing the date Aug. 4, 1977) gave Hinderstein a $24 credit for maintenance equipment, reducing the purchase price to $9,730. The later agreement superseded the original contract; it had the same terms as the previous agreement, except for the maintenance equipment credit and San Juan Pools' promise to install a 32-square-foot concrete walk at no charge. The second contract was signed by Hinderstein and Shore. On the second contract, San Juan Pools listed a contractor's license number which was subsequently conceded to be invalid during the course of work on Hinderstein's pool. Moreover, King admitted that neither his name nor the words "King Development Company" appeared on either of the two written agreements.

King did not receive a specialty class C-53 (swimming pool construction) license until July 13, 1978, which postdated the filing of King's

complaint. This specialty license was issued in the name of "King Development Company."

The trial court also found the following facts, which are not disputed by King: (1) San Juan Pools did not start or finish work upon the dates contained in the first contract; (2) San Juan Pools did not obtain a building permit before commencing work or obtain a final inspection from the pertinent county agencies; (3) San Juan Pools did not perform an electrical continuity test on the swimming pool, even though such an omission might jeopardize the safety of pool users; and (4) the pool was otherwise free from defects.

King admitted that the plans under which installation of the Hinderstein pool progressed were not in existence at the time of the August 4 contract execution. He did not know whether more detailed drawings of the pool were ever disclosed to Hinderstein.

King instituted the present suit because he never received the balance of monies due under the Hinderstein contract. Hinderstein said he only paid the down payment to San Juan Pools because "somewhere the contractor has taken or used the money that was earmarked for the construction of the pool." Hinderstein also stated that he never received any package of papers showing scaled drawings or detailed plans of the pool installed by San Juan Pools.

The trial court made the following pertinent findings of fact: "15. Plaintiff's written contracts with Defendant *do not contain*: (1) a plan and scale drawing showing the shape, size, pool dimensions, construction and equipment specifications for the swimming pool and Defendant was not given such information in a separate document or documents; (2) a provision that no additional work could be done without prior written authorization from Defendant; (3) the name of Plaintiff; (4) Plaintiff's contractor's license number 338644; and (5) Plaintiff's contractor's license classification.

"16. Plaintiff's second contract with Defendant which superseded the first contract, did not contain a commencement or a completion date.

"17. Plaintiff's written contracts with Defendant provided for a down payment far in excess of the greater of Fifty Dollars ($50.00) or one percent (1%) of the contract price."

In denying judgment to King, the court made these conclusions of law: "1. Plaintiff's written swimming pool contracts violate Sections 1729, 1730, and 1730.5 of the Civil Code of the State of California and are void and unenforceable under Section 1735 of the Civil Code.

"2. Plaintiff cannot maintain an action in any court of this state for the collection of compensation from Defendant since Plaintiff was not a duly licensed contractor at all times during the performance of his contract with Defendant, and further, Plaintiff had not substantially complied with this state's contractor's licensing statutes under the Business and Professions Code.

"3. Plaintiff doing business as SAN JUAN POOLS OF SAN LUIS OBISPO took no active part in the supervision of the construction necessary in the performance of the contract with Defendant, and any license Plaintiff might have possessed from the State of California's Contractors Licensing Board would have been a *nullity* under the reasoning of *Rushing* v. *Powell* [(1976)] 61 Cal.App.3d 597.

"4. Plaintiff violated California Administrative Code Title 16, Section 760(b)."

## DISCUSSION

■   The principal issue in this appeal involves a question of statutory construction. We are called upon to determine whether the installation of a prefabricated swimming pool and the related work thereto is covered by statutes designed to govern transactions between customers and contractors engaged in the construction of swimming pools. For reasons hereinafter stated, we answer this question in the affirmative.

In our opinion, the record clearly shows that the San Juan Pools-Hinderstein agreements violated several provisions of former Civil Code section 1725 et seq., a statutory scheme specifying certain terms that must be contained in "every contract for the construction of a swimming pool, ..." (Former Civ. Code, § 1727.)[8] These former provisions

---

[8] Former Civil Code sections 1725 through 1736 were originally added by Statutes 1969, chapter 583, section 1. Former section 1730.5, which dealt with schedule of payments under swimming pool contracts, was added by Statutes 1974, chapter 1228, section 1, pages 2668-2669. These provisions were repealed in 1979 (Stats. 1979, ch. 747, § 3) and incorporated with minor revisions into the Business and Professions Code (Bus. & Prof. Code, §§ 7165-7173; see Stats. 1979, ch. 747, § 2). Recent legislation

of the Civil Code (now Bus. & Prof. Code, §§ 7165-7173), at the time of the present suit, applied to contracts for a swimming pool entered into by a swimming pool contractor, if the contracts involved construction of pools to be built for the use and enjoyment of a single-family unit upon or contiguous to premises occupied by a single-family unit and if the pool construction was not part of the original plan by the contractor responsible for the single-family dwelling unit construction. (Former Civ. Code, §§ 1726, 1727, 1733.)[9] We believe the San Juan Pools agreement violated this former statutory scheme in the following respects: (1) the second contract did not establish a completion date;[10] (2) neither agreement contained a plan or scale drawing of the pool nor provided that additional work could not be done without prior written authorization from the buyer;[11] (3) none of the contracts mentioned King as contractor, contained a correct license number, or specified King's classification;[12] and (4) the provision for a down payment of one-third of the total purchase price exceeded the amount allowable under the statutory scheme.[13] Although recognizing that any agreement

has also clarified the incongruity formerly existing between provisions regulating swimming pool construction contracts and home improvement contracts. (Bus. & Prof. Code, §§ 7151, 7171; Stats. 1980, ch. 138, §§ 3, 9.)

[9]No dispute is made by King about his status as a "swimming pool contractor" within the meaning of these provisions. Moreover, King does not argue that he was the contractor for Hinderstein's residence or that he was installing a pool for other than a single-family unit.

[10]Former section 1728 stated: "Every contract for the construction of a swimming pool shall set out a date certain on which all construction is to be completed."

[11]Former section 1729 stated: "Every contract for the construction of a swimming pool shall contain a plan and a scale drawing showing shape, size, pool dimensions, and construction and equipment specifications for the pool as approved by the person contracting for construction, shall particularly describe the work to be done, and shall provide that no additional work shall be done without prior written authorization of the person contracting for the construction of the pool. Any such authorization shall be on a contract change-order forms shall be incorporated in, and become a part of, the contract."

[12]Former section 1730 provided: "Every contract for the construction of a swimming pool shall contain the name of the contractor, his license number, and classification."

[13]Former section 1730.5 read in pertinent part: "(a) Every contract for the construction of a swimming pool shall include a schedule of payments. The contract shall state the amount of each such payment as a sum in dollars and cents.

"(b) If the payment schedule contained in the contract provides for a downpayment to be paid by the owner to the swimming pool contractor before the commencement of work, such downpayment shall not exceed fifty dollars ($50) or 1 percent of the contract price, excluding finance charges, whichever is the greater.

"(c) The payment schedule requirements of subdivision (b) pertaining to the downpayment shall not apply when the contract provides for the swimming pool contractor to furnish completion and performance bonds covering 100 percent of the contract and such bonds are furnished by the swimming pool contractor.

"(d) In no event shall the payment schedule provide for the swimming pool contrac-

not complying with these provisions is void,[14] King contends that the statutory scheme was inapplicable to the Hinderstein work and the trial court erred in determining otherwise.

The basis for King's argument is found in the numerous references to "*construction* of a swimming pool" in the former statutory provisions.[15] From this, King urges that former sections 1725 to 1736 were meant to only encompass *construction* of a *conventional* pool rather than the *installation* of a *prefabricated* pool. Accordingly, he urges that the trial court erroneously voided the Hinderstein agreement pursuant to these code provisions. We are not persuaded for the following reasons.

First, a careful examination of the record confirms the obvious— many construction-like activities are intertwined with the installation of a prefabricated pool. Notwithstanding the fact that the pool shell was bought from an independent manufacturer, King testified that he hired subcontractors who engaged in excavation, plumbing, electrical, and concrete finishing work around the installed pool. Although noting the differences in installation, King also conceded that the construction activities involved therein were considerable and that the pool installation "include[d] the related work" of the subcontractors. The written agreements also contained "agreed conditions" about the completion date of the *construction* and about Hinderstein's agreeability to pay for additional costs encountered because of problems with underground obstacles, unusual ground conditions, or water seepage. In sum, these facts belie the assertion that installation of *this* prefabricated pool did not involve construction activities normally associated with a conventional pool.

---

tor to receive payment in excess of 40 percent of the total contract price, excluding finance charges, prior to the completion of the reinforcing steel and preparatory to the placement of concrete or gunite." (See also 52 Ops.Cal.Atty.Gen. 245, 248-249 (1969).) In addition to the excessiveness of the initial down payment, subdivision (d) was violated; San Juan Pools received two-thirds of the purchase price under the payment schedule upon delivery of the pool shell, an amount which exceeded the 40 percent allowable before completion of any concrete/gunite work.

[14]Former section 1735 provided: "Any contract for the construction of a swimming pool which does not comply with the applicable provisions of this title shall be void and unenforceable as contrary to public policy."

[15]See, e.g., former Civil Code sections 1725, subdivision (a), 1726-1733, 1735. King emphasizes the fact that former section 1730.5, subdivision (d), specified that a contractor could not receive more than 40 percent of the contract price in payment "prior to the completion of the reinforcing steel and preparatory to the placement of concrete or gunite."

Second, the public policy underlying the enactment of former section 1725 et seq. is promoted by holding that installation of prefabricated pools such as the present one falls within the scope of these provisions. Former section 1725 stated: "(a) The Legislature finds that a need exists for a more complete understanding between customers and contractors engaged in the swimming pool construction business regarding the content and conditions of transactions for swimming pool construction; that many misunderstandings have arisen because of the lack of a standard body of requirements relating to such transactions, and that certain sales and business practices, and construction practices, have worked financial hardship upon the people of this state; that the swimming pool construction business has a significant impact on the economy and well-being of this state, its communities, and its individual citizens; that the problems which have arisen relative to the swimming pool construction business are peculiar to that business; and that the provisions of this title relating to the swimming pool construction business are necessary for the public welfare.

"(b) The Legislature declares that the purpose of this title is to create an area of understanding and to establish standards which will safeguard the people against imposition and financial hardship, and encourage competition, fair dealing, and prosperity in the swimming pool construction business."

This declaration evinced a legislative concern for protecting the public from fly-by-night contractors—independent from the builders of the residential house associated with the property—who abandon pool work after obtaining a substantial down payment or who finish the work in a substandard manner. (52 Ops.Cal.Atty.Gen. 245, 247-248 (1969).)[16] At the time of the enactment of the above legislation, it is apparent most pools being built were of the conventional variety; they required the use of reinforcing steel, concrete, gunite and other such materials. With the advent of the prefabricated goods market, many builders resorted to subsurface installation of pool shells supplied by independent manufacturers. Contrary to the position posited by King, it is absurd to believe the Legislature's concern for protecting pool buyers depended on the type of material used for pool installation.

[16]Legislative committee analyses on the payment schedule requirements under the former Civil Code scheme (former Civ. Code, § 1730.5; Sen. Bill No. 1836) and the present codification (Bus. & Prof. Code, §§ 7165-7173; Assem. Bill No. 1309) shows concern over the fact that consumer complaints to the Contractors License Board about

Instead, the logical import of the legislative enactment was regulation of builders who contracted to install a swimming pool as a fixed part of a buyer's property, be it by conventional construction or by installation of a prefabricated unit. This viewpoint is supported by the following statement found in an Attorney General's opinion issued shortly after the enactment of the legislation under consideration here. That opinion stated: "... it must be remembered that section 1729 and the entire act is aimed at pool *construction* contracts. Agreements providing for pool equipment, not provided for in the original contract, which requires little or no installation and for which there is no installation charge, for example additional pool ropes and floats, are not meant to be included by the phrase 'additional work' in section 1729. *This is indicated by the words 'construction' and 'work' found in this section, which words connote actual building or substantial installation.* So long as the equipment being sold and delivered would not give rise to any mechanics liens or *would not become a permanent fixed part of the overall pool project*, it is not covered by the act." (52 Ops.Cal.Atty.Gen. 245, 250 (1969), italics added.) Further support comes from the recent legislative modification of the payment schedule provisions. Originally, former Civil Code section 1730.5 allowed no payment in excess of 40 percent of the contract price "prior to the completion of the reinforcing steel and preparatory to the placement of concrete or gunite." In 1979, the Legislature revamped these provisions to read that a contractor could only receive "final payment at the completion of the final plastering phase of construction provided that any installation or construction of equipment, decking, or fencing required by the contract is also completed." The deletion of the "concrete/gunite" language and substitution of the "plastering/installation" phraseology suggests a legislative recognition that prefabricated units are now installed as pools—a practice not in vogue when the former Civil Code provisions were formulated. This subsequent legislation is helpful in showing that the installation under consideration here was within the purview of the former scheme, since it is the type of activity from which consumers need protection.

Accordingly, in order to further the protection contemplated by the Legislature, swimming pool construction as used in former section 1725 et seq. should be held to refer to subsurface installation of a prefabricated pool which becomes a fixed part of the residential realty. Since there was substantial installation work involved with King's perfor-

swimming pool construction were proportionately higher than for other types of construction.

mance, we conclude his conduct was subject to the swimming pool construction provisions of former section 1725 et seq.[17]

Finally, examination of analogous provisions in the Contractors License Law[18] provides further support for the conclusion that subsurface installation of prefabricated pools should be regulated like conventional pool construction. One of the activities exempted from the Contractors License Law is "the sale or installation of any finished products, materials or articles of merchandise, which do not become a fixed part of the structure . . . ." Furthermore, its provisions do not apply "to a materialman or manufacturer furnishing finished products, materials, or articles of merchandise who does not install or contract for the installation of such items." (Bus. & Prof. Code, § 7045, subd. (a).) Since the Contractors License Law (like former Civ. Code, § 1725 et seq.) is designed to protect the consumer,[19] we examine the case law under this statutory scheme for purposes of ascertaining the type of construction regulated by its provisions.

Although mere assembly and bolting of a metal prefabricated restroom to an existing concrete foundation does not represent the type of conduct to be regulated under the Contractors License Law (*Walker* v. *Thornsberry* (1979) 97 Cal.App.3d 842, 847-848 [158 Cal.Rptr. 862]),[20] California cases have recognized that many installation and excavation activities of a substantial nature are covered under licensing legislation. (See, e.g., *Johnson* v. *Mattox* (1968) 257 Cal.App.2d 714,

---

[17]We note the same result could be reached by adopting the definition provided by King. In his opening brief, King states that "construct" means "the act of putting parts together to form a complete integrated object." King admits providing the related work—e.g., excavation, plumbing, electrical, concrete decking/finishing—which made the prefabricated shell an integrated object with the land. Thus, using King's terminology, there was a "construction" after completion of the pool on Hinderstein's property.

[18]Business and Professions Code section 7000 et seq.

[19]The Contractors License Law is intended to protect the public against dishonesty and incompetence in the operation of the contracting business and in the performance of contract services. (*Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 149-150 [308 P.2d 713]; *Rushing* v. *Powell* (1976) 61 Cal.App.3d 597, 604-605 [130 Cal.Rptr. 110].) Similarly, former Civil Code section 1725 et seq. were expressly designed "to create an area of understanding [between customers and contractors engaged in the swimming pool construction business regarding the content and conditions of transactions for swimming pool construction] and to establish standards which will safeguard the people against imposition and financial hardship, and encourage competition, fair dealing, and prosperity in the swimming pool construction business." (Former Civ. Code, § 1725, subd. (b); see also § 1725, subd. (a).)

[20]In reaching this conclusion, the *Walker* court analyzed the facts before it and stated: "The contract between Super Secur and defendant did not require Super Secur to undertake the installation of concrete foundation, rough plumbing, or installation of plumbing fixtures, stalls, wood roofing, and painting upon which to place the prefabri-

718 [65 Cal.Rptr. 185] (installing sprinkler systems, building various signs and setting them in concrete, and excavating and constructing dugouts); *American Sheet Metal* v. *Em-Kay Engineering* (E.D.Cal. 1979) 478 F.Supp. 809, 813 (supplying and installing of steam generating equipment which became permanent plant fixtures).)

California case law demonstrates that *substantial installation* is to be considered within the purview of the Contractors License Law, since the public needs protection from builders who engage in work—be it construction or installation—upon projects which are or are to become a part of the underlying realty. Since an express concern of the statutes under question here is consumer protection, there is ample reason for subjecting the subsurface installation activities of King to the operation of former Civil Code section 1725 et seq. Moreover, the above authority shows that a question of fact is involved in determining when installation activities of a builder are subject to the contractor licensing laws. (See, e.g., *Walker* v. *Thornsberry, supra*, 97 Cal.App.3d at p. 847.) In the present context, the evidence shows that King employed subcontractors who engaged in work which made the prefabricated pool a fixed part of Hinderstein's realty. Accordingly, substantial evidence supports the trial court's finding that King contracted for both "construction and installation of a prefabricated swimming pool on Defendant's property."

We limit our present holding to the substantial installation engaged in by King and his subcontractors. Nothing in this opinion should be read as suggesting that hot tubs or jacuzzis—which lack either permanent attachment to the realty or significant construction activity—are within the purview of the legislative scheme affecting swimming pool construction.

In light of the foregoing disposition, it is unnecessary to review in detail the trial court's other conclusions. It is sufficient to note that these additional conclusions of law are also correct.

The judgment is affirmed.

Hanson (P. D.), J., and Andreen, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 7, 1981.

cated restroom. Super Secur employees merely assembled the pieces and bolted the structure to the foundation. Their contribution of labor to the finished restroom was at most minor and incidental." (*Walker* v. *Thornsberry, supra*, 97 Cal.App.3d at p. 848.)